UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

| | |
|---|---|
| Elaut N.V., *et al*. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Remark Industries LLC. | ) |
| | ) Case No.: 6:24-cv-1499 |
| Defendant and Third Party Plaintiff, | ) |
| v. | ) |
| | |
| Elaut USA, Inc., and | |
| Coast to Coast Entertainment LLC, | |
| | |
| Third-Party Defendants. | |

**PLAINTIFF'S ELAUT N.V. AND COAST TO COAST ENTERTAINMENT, LLC'S OPENING CLAIM CONSTRUCTION BRIEF**

Plaintiff Elaut N.V.'s and Coast to Coast Entertainment, LLC's ("Elaut" and "CTC" ) by and through its undersigned counsel, pursuant to the Scheduling Order (DCK 43), submits its Claim Construction Brief.

**I.      INTRODUCTION**

Elaut and CTC respectfully submits its proposed claim construction brief for the utility patent-in-suits, namely U.S. Patent No. 8,251,369 (hereinafter the '369 Patent, Exhibit A) and

1

U.S. Patent No. 10.638,857 (the '857 Patent,. Exhibit B). The '369 and 857 Patents are referred to as the "Patents in Suit."

## II.     APPLICABLE LAW

### A.     This Court's Exclusive Jurisdiction.

A determination of infringement requires a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted... [Second,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*) (*citations omitted*). Step one, claim construction, is an issue of law to be resolved exclusively by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384-85 (1996); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 804 (Fed. Cir. 2007).

### B.     Intrinsic Versus Extrinsic Evidence.

In claim construction, courts examine the patent's intrinsic evidence to define the scope of the patented invention. *Markman*, 517 U.S. at 384-85; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence for a patent includes the claims themselves, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*). *See also C.R. Bard*, 388 F.3d at 861. Courts generally give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Id. at* 1312-13. *See also Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1397 (Fed. Cir. 2008).

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard,* , 388 F.3d at 862).

### C. Principles of Claim Construction.

**Ordinary and Customary Meaning**. Construction of claims begins with and focuses on the language of the claims, themselves; indeed, "[i]t is a bedrock principle of patent law that the claims . . . define the invention to which a patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotations omitted).

Often, the claim language itself is sufficient to resolve the parties' dispute. *Id.* Technical dictionaries and treatises may help a court understand the manner in which one skilled in the art might use claim terms and the relevant technology of an invention. *Phillips*, 415 F.3d at 1322 ("Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation.") (citing *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 134 (1942)); *see also Weber Elec. Co. v. E.H. Freeman Elec. Co.*, 256 U.S. 668, 678 (1921); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1247-53 (Fed. Cir. 1998).

**Perspective of Claim Interpretation**. Patent claims are construed from the perspective of a hypothetical "person of ordinary skill in the art" whose knowledge is contemporaneous with the date of the invention. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115-16 (Fed. Cir. 2004) (*en banc*).

**Surrounding Claim Language Must Be Considered**. Where the interpretation of claim terms is in dispute, the Federal Circuit places great emphasis on the words surrounding the claims and providing context for them. *Philips*, 415 F.3d at 1314 ("Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms."). *See, also, Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003)

("the context of the surrounding words of the claim also *must* be considered in determining the ordinary and customary meaning of those terms") (emphasis added).

**Exceptions to Plain Meaning**. The Federal Circuit recognizes limited exceptions to the general rule that claims are to receive their ordinary meaning; examples are where the "patentee has chosen to be his or her own lexicographer by clearly setting forth an explicit definition" or "where the [claim] term or terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used." *Johnson Worldwide Assoc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

**The Value of Other Claims**. Notably, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314 (citing *Vitronics*, 90 F.3d at 1582). Indeed, "[t]he doctrine of claim differentiation stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Seachange Int'l, Inc. v. C-Cor, Inc.,* 413 F.3d 1361, 1368 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]he doctrine is at its strongest where the limitation sought to be read into an independent claim already appears in a dependent claim...." Id. at 1368-69 (internal quotation marks omitted).

**The Role of the Patent Specification**. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because patentees are their own lexicographers, and are permitted to define their own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow

4

the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.*

When a patentee has clearly defined the scope of the invention in the specification, it is not only proper, but necessary, for claim constructions to confine the claims to that which the inventor has truly invented. *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006) ("the scope and outer boundary of claims is set by the patentee's description of his invention."); *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose."). *See also Astrazeneca AB v. Hanmi USA, Inc.*, No. 2013-1490, 2013 U.S. App. LEXIS 25199 **8-9 (Fed. Cir. 2013) (finding claims to be confined to structure identified as "new" and "novel" in the specification).

Nevertheless, while the claims are to be read in light of the specification, limitations from the specification are not to be read into the claims. *Phillips*, 415 F.3d at 1323, (citing *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 998)) ("[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification."). *See also Continental Circuits LLC v. Intel Corp. et al.*, (The Court "acknowledge[d] the difficulty in drawing the 'fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims'," saying that, "[t]o avoid improperly importing limitations into the claims, 'it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention.'") In *Continental Circuits LLC v. Intel Corp.* the court further indicated "absent 'clear and unmistakable' language suggesting otherwise" – that the invention as a whole necessarily required further limitations --

5

statements in the specification "do not meet the 'exacting' standard required to limit the scope of the claims." *Id.* at 798.

**The Role of the Prosecution History**. In its construction of the claims, the court must examine not only the specification but also patent prosecution history. *Phillips*, 415 F.3d at 1313 (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed.Cir.1998)) ("[T]he court starts the decisionmaking process by reviewing the same resources as would that person, *viz.*, the patent specification and the prosecution history."); *See also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term ... in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description *and the prosecution history*.") (emphasis added).

Like the specification, this history of how the claims came to be patented before the U.S. Patent and Trademark Office (PTO), is a vital tool that offers context for claim interpretation; it "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. In this history is a reflection of how inventive subject matter is viewed by both the inventor and the PTO examiner. *Multiform Desiccants*, 133 F.3d at 1478 (stating "[t]he evolution of restrictions in the claims, in the course of examination in the PTO, reveals how those closest to the patenting process – the inventor and the patent examiner – viewed the subject matter.").

## III.   BRIEF SUMMARY OF THE INVENTIONS

The Elaut '369 Patent was filed in on May 13, 2010 and issued on August 28, 2012. The '369 Patent is generally directed to a "pick-up" amusement game or crane having (1) at least one translucent panel making up a housing for the game, (2) a pattern of multicolored LEDs on the inner side of the panel and (3) a control unit connected to the panel and adapted "to impart a determined impression of color to at least one panel." Exhibit A. The resulting assembly provides a pleasing visual effect. Elaut's '369 patent was allowed without any rejection or

amendments made to the claims. Declaration of Andrew C Aitken in Support of Elaut N.V.'s and Coast to Coast Entertainment LLC's Opening Claims Construction Brief, ¶ ,

The '857 Patent was filed on December 23 2017 by an employee of Elaut's U.S. subsidiary, Elaut USA, Inc. The '857 patent was issued on May 5, 2020 and Defendant and Third Party Plaintiff Remark Industries LLC ("Remark") has claimed ownership. The '857 Patent is generally directed to a display case with (1) at least one lower translucent panel, (2) "a pattern of multicolor LEDs" behind the translucent panel and (3) a control unit that "imparts a determined impression of color to at least one panel." Exhibit B.

## IV. DISPUTED TERMS

The parties' competing constructions for each disputed term are set forth below, each construction followed by a discussion of the reasons Desktop's proposals are correct and should be adopted by the Court.[1]

### 1. "multicolor LEDs"

| Claim Term | Elaut's Proposed Construction | Remark's Proposed Construction |
| --- | --- | --- |
| multicolor LEDs (Claim1 ) | Refers to light emitting diodes that transmit multiple colors of light either from a plurality of different single color LEDs or a RGB (red green Blue) LED contained in a single unit or package. | A single device with a single control unit and having at least two interior components, the interior components connected to the single control unit and having one common interior connection, the interior components for receiving relative voltages to provide more than discrete output. |

---

[1] Elaut contends that ordinary level of skill in the art ("A PHOSITA") would have (i) a bachelor's degree or equivalent in electrical engineering, computer engineering, electro-mechanical engineering and (ii) 1-3 years of experience relating to game design and construction. .

The ordinary meaning of "multicolor" according to dictionaries supports Elaut's proposed construction.

- " having more than two colors : multicolored (Merriam-webster.com/dictionary/multicolor; accessed June 2025.)

- Of many or various colors; many coloured, variegated (Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=multicolored; accessed July 2025)

- of several or many colors (Dictinary.com https://www.dictionary.com/browse/multicolored; accessed July 2025)

Both patents-in-suit refer to "multicolor LEDs" and the term is not specifically defined in either patent. As set forth below, the discussions of multicolor LEDs in the patents are identical. When referenced in the specifications of the respective patents-in suit, the multicolor part was limited to discussions of specific or preferred embodiments. *See below*. The specification provides examples and explanations to help understand the invention, but these examples are illustrative, not limiting, unless the claim language explicitly requires such a limitation. Embodiments, examples of the specifications, are illustrative but not limiting. *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) ("'Although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.'" (quoting Phillips, 415 F.3d at 1323)).

| Elaut's 369 Patent | Remark '857 Patent |
|---|---|
| … and a pattern of **multicolor LEDs** is provided on the inner side of the housing behind this at least one translucent panel. Abstract. | and a pattern of multicolor LEDs is provided on the inner side of the housing behind this at least one translucent panel… Abstract |
| According to an embodiment….<br><br>A pattern of **multicolor LEDs** is provided inside the housing behind this at least one translucent panel. The multicolor LEDs are connected to a control unit for controlling the | According to an embodiment …<br><br>A pattern of **multicolor LEDs** is provided inside the housing behind this at least one translucent panel. The multicolor LEDs are connected to a control unit for controlling the |

| | |
|---|---|
| color emitted by each multicolor LED. Column 1, lines 38-44 | color em6itted by each multicolor LED. Column 1 line 62, …Column 2, line 6. |
| According to a preferred aspect of the invention, the pattern of **multicolor LEDs** is arranged such that a substantially uniform impression of color is imparted to said at least one translucent panel. Column 1, Lines 44-47. | According to a preferred aspect of the invention, the pattern of **multicolor LEDs** is arranged such that a substantially uniform impression of color is imparted to the at least one translucent panel. Column 2, line 9-13. |
| Preferably, the **multicolor LEDs are RGB LEDs** capable of covering the full color spectrum. Colum 1 lines 47-48 | Preferably, the **multicolor LEDs are RGB LEDs** capable of covering the full color spectrum. Column 2. Lin 13-14 |
| According to a further possibility, an edge between the front wall and the first side wall may be provided with an elongate profile of a translucent material behind which a **pattern of multicolor LEDs is arranged**. Column 2, lines 14-18 | According to a further possibility, <u>a corner</u> edge between the front wall and the first side wall may be provided with an elongate profile of a translucent material behind which a **pattern of multicolor LEDs** is arranged Column 2, lies 26-29 |
| According to a further aspect of the invention, the at least one translucent panel may comprises a translucent panel with a relief, wherein a **pattern of multicolor LEDs** is arranged in this relief. Column 3 lines 61-65 | According to a further aspect of the invention, the at least one translucent panel may comprises a translucent panel with a relief, wherein **a pattern of multicolor LEDs** is arranged in this relief. Colum 4, lines 27-29. |

It is submitted that one ordinary skilled in the art, encountering the term "multicolor LEDs" in the context of the patents would understand that the term "multicolor" does nor was it not intended to limit the claims to a particular class or category of light emitting diodes. Rather, a PHOSITA would interpret the term "multicolor LEDs" which are arranged in a pattern as claimed, refers to an array or pattern of LEDs that emit multiple colors of light. The particular category or type of multicolor LEDs that achieves this result is inapposite to the invention that is directed to "imparts a determined impression of color to at least one panel."

Elaut's proffered interpretation is also consistent with the canons of claim construction and differentiation. Claim 1 recites multicolor LEDs and claims 3 then limits the multicolor LEDs to RGB LEDs. Since the ordinary meaning of "multicolor" means more than two colors, it

stands to reason that the multicolor LEDs in claim 1 may refer to a plurality of different, single color LEDs.[2]

In any event, Remark's proffered construction is completely untethered to the specification and introduces new undefined and vague limitations such as "requiring "two interior components" that are connected to a "single control unit" both of which are undefined and have no support from the specification.

While the term "multicolor LEDs" may sometimes be used to describe a device that includes a plurality of different diodes that emit different color light from a single shell or lens, this usage is not consistent in the industry.[3] For example, the term "multicolor LED" is also used in the industry to describe the use of a plurality of uniform color or single color LEDs each having its own separate shell or lens, that are sold as a unit. Exhibit C. See below:

Home / Optoelectronics & Displays / PCB Mount Indicators / Multicolor LED Circuit Board Indicators

**Multicolor LED Circuit Board Indicators: 204 Products Found**

---

[3] When words used in claims have more than one possible meaning, our canons of claim interpretation are the tools that permit resolution of disputes as to the correct meaning of claim language. In this case, the district court recognized that the word "portion" could be defined, from the perspective of dictionary sources. See *Rexnord Corp v. Laitram Corp*, 274 F.3d 1336, 2001 WL 1456191 (Fed. Cir. 2001)



These products are not designed to emit different colored light depending on the respective input voltage to each diode but each single color diode may be sequentially illuminated to reflect operating status.

The term "multicolor LED" lights is also used to describe single color LED units sold in a group. See Exhibit D.



The use of the term multicolor LED in Exhibits C and D is fully consistent with Elaut's suggested interpretation.

In summary, Remark's suggested interpretation attempts to incorporate multiple new limitations into the term, limitations that have no antecedent basis in the specification. The specification neither discuss nor teaches an LED with "interior components connected to the single control unit" and nor a structure "having one common interior connection", nor "interior components for receiving relative voltages to provide more than discrete output." Moreover, this definition is at odds with the common uses of the term multicolor LED when used to describe a plurality of single color LEDS arranged in a pattern such as shown in Exhibit C or as in Exhibit D.

In summary, Remark asks the court to selectively adopt a description that not required by the patents-in-suit and the special and narrow meaning it advocates is not universally accepted in the manner it has described.

### 2. "Light Transmission"

| Claim Term | Elaut's Proposed Construction | Remark's Proposed Construction |
|---|---|---|
| Light Transmission. (e.g., Claim 5 of the '857 Patent, Claim 4 of the '369 Patent) | Refers to how well a material transmits incident light and is measured by quantifying the fraction of incident light that passes through a material. This ratio is often expressed as a percentage. | The transfer of an optical signal from a source through air or a device. |

To the extent that the term requires construction, it is submitted that Elaut's proposed construction is both accurate and helpful to the finder of fact because it provides a nexus between the claimed percentage range and the term "light transmission." In this regard, Claim 4 of the '369 Patent recites, in part, "that at least one of the translucent has a light transmission of lying between 10% and 60 %." Without a reference to a measurable characteristic, it is submitted that a broad definition is not helpful to the understanding of the patent or its context of the invention.

Support for Elaut's proffered construction can be found in industry and physics publications: See Exhibit E.

> "Light transmission refers to the amount of light that can successfully pass through glass and other types of materials. Further, when measured, transmission is usually expressed through a calculated percentage of the light that can pass through the materials being tested." https://gamma-sci.com › 2021/11/04 › light-transmission. *Id*.

*See also* https://www.lawinsider.com/dictionary/light-transmission; ("Light transmission means the ratio of the amount of total visible light to pass through a product or material to the amount of the total light falling on the product or material.")

Remark's proposed construction, is incomplete and may confuse the fact finder. It is incomplete because, in addition traveling "through air or a device" light may be transmitted through liquid, such as water, gases other than air, or through a vacuum. Remark's proposed construction is confusing because its use of the term "signal" suggests that there is some form communication transmitted. Also the use of the term "device" in the claims construction is inappropriate in the context of the Patent sin suit because the term "device" conventionally refers to a piece of mechanical or electronic equipment – not a material such as glass, or as here, a translucent panel.

### 3. Light Diffusion Factor

| Claim Term | Elaut's Proposed Construction | Remark's Proposed Construction |
|---|---|---|
| Light Diffusion Factor: (e.g., Claim 8 of the '857 Patent, Claim 6 of the '369 Patent ) | Refers to the ratio of luminance (light intensity) at an angle (e.g., 30 degrees) to the luminance at 0 degrees (perpendicular to the surface).<br><br>**Elaut's Revised Construction:[4]**<br><br>The light diffusion factor is determined using the DIN 5036 test method. | The amount or percentage of scattering of an optical signal from a source though air or a device. |

While Remark's proposed construction broadly captures the claimed term light diffusion

---

[4] Elaut's proposed revised construction was not previously identified or disclosed to Remark. However, since the claim construction exercise is a matter of law, and the information on which the proposed construction is in the '365 Patent, it is submitted that the Court can and should consider Elaut's belatedly proposed construction.

factor, it is not entirely accurate for the reasons set forth above.[5] Elaut's proposed construction is preferred because it provides improved clarity to the jury and includes an explanation of the term "factor" which is manifest in a numerical value that may be mathematically determined. The patent used a DIN 5036 test method. See Exhibit A, Column 5, lines 20-26. See also Exhibit F.

### 4. "Good Light Diffusion Properties"

| Claim Term | Elaut's Proposed Construction | Remark's Proposed Construction |
| --- | --- | --- |
| "Good light diffusion properties." | Refers to a translucent panel having a light diffusion factor lying between 0.70 and 1.00 | The amount of scattering of an optical signal from a source through air or a device relative to the desired amount of scattering |

Elaut's proffered construction is supported by the specification which discusses "good light diffusion properties." *See* Exhibit A, Column 1; lines 56-60. (" The at least one translucent panel is preferably manufactured from a white translucent materials having good light diffusion properties.. Typically the material of the translucent panel has a light diffusion factor lying between 0.70 and 1.00." );  Column 5, lines 20-26. ("The translucent panel is typically manufactured from a translucent material. Such as a translucent polycarbonate having good light diffusion properties. The material typically has a white color, and preferably has a light diffusion factor lying between 0.70 and 1.00 (DIN 5036 test method), and lying for instance between 0.75 and 0.90.)

Remark's proposed construction introduces a new term into the definition  -- the desired amount of scattering"  and requires the finder of fact to apply a subjective and qualitative

---

[5] Remark's definition that limits the scattering "through air or a device," is in inaccurate as light may be transmitted and scattered through liquid, such as water, and gases other than air, or through a vacuum.

standard to the claim analysis that is untethered to the specification. For that reason, Remark's proposed construction should be declined.

## IV. CONCLUSION

For the foregoing reasons, and those to be stated in later briefing and at argument, Elaut respectfully requests that the Court adopt its proposed constructions.

Respectfully submitted,

By  /S/ Andrew C. Aitken

Andrew C. Aitken (Md. Bar No. 06413)
6701 Democracy Blvd., Suite 555
Bethesda, MD 20817
Direct (301) 537-3299

Mark F. Warzecha, Esquire
WIDERMAN MALEK, P.L.
Florida Bar No.: 95779
1990 W. New Haven Ave., Ste. 201
Melbourne, FL 32904-3923
Phone: (321) 255-2332
Fax: (321) 255-2351
Email: MFW@USLegalTeam.com

*Attorney for Elaut N.V and Coast to Coast Entertainment, LLC*